## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JENNIFER LYNN WILLIAMS,** | : | **Civil No.  1:20-CV-946** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **KILOLO KIJAKAZI**, | : | |
| **Acting Commissioner of Social Security,[1]** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

### I.    Introduction

The Supreme Court has underscored for us the limited scope of our substantive review when considering Social Security appeals, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see,

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

> e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

Jennifer Williams applied for disability insurance benefits under Title II of the Social Security Act on August 16, 2016, alleging an onset date of disability of May 1, 2012. A hearing was initially held before an Administrative Law Judge ("ALJ") on January 22, 2018, and a second hearing was held on May 6, 2019 after a continuance to allow the plaintiff to obtain counsel. Following the second hearing, the ALJ found that Williams was not disabled during the period of time between May 1, 2012 and December 31, 2017, the date she was last insured, and denied Williams' application for benefits.

Williams now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence. However, after a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in

this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner.

## II.   <u>Statement of Facts and of the Case</u>

Williams filed her Title II claim for disability benefits on August 16, 2016. On May 6, 2019, Williams appeared before an ALJ, alleging an onset date of May 1, 2012, and her date last insured was December 31, 2017. (Tr. 16). Williams alleged disability due to depression, fibromyalgia, ADHD, chronic fatigue syndrome, degenerative disc disease of the lumbar spine, migraines, thoracic outlet syndrome, chronic right lower quadrant pain, cervical radiculitis/cervicalgia, and thoracic and lumbosacral neuritis. (Tr. 331). Williams had a high school education and past work as an office coordinator and medical receptionist. (Tr. 332).

Williams had a history of neck pain and lower back pain. It was noted that she had been in a motor vehicle accident in July of 2013. (Tr. 617). Treatment notes from her primary care physician, Dr. Piper, indicate that in July of 2013 she was taking medication for fibromyalgia but reported joint pain, muscle pain, and joint swelling. (Tr. 617-18). In October 2013, it was noted that Williams ambulated with a slight antalgic gait, but her hip strength and range of motion were normal, and she was comfortable sitting and standing. (Tr. 621). At a follow up appointment, it was noted that Williams was improving after receiving an epidural injection, and her pain

went "from an 8 to at least a 6 or maybe somewhat less." (Tr. 622). Treatment notes also indicated that Williams' fibromyalgia may have been overlapping with her back pain symptoms. (Tr. 623). Throughout 2014 and 2015, it was noted that Williams exhibited an "[a]ge appropriate range of motion and strength" on physical examination. (Tr. 683, 685, 689). January 2015 treatment notes indicate that Williams had full range of motion in her upper and lower extremities and walked with a normal gait for her age. (Tr. 730). However, in March and May of 2015, it was noted that Williams was experiencing more fibromyalgia pain. (Tr. 722, 731). In September, notes from Nutrition Support Services indicated Williams was exercising, using the elliptical and free weights at times. (Tr. 582).

At this time, Williams was also seeing a pain management specialist, Dr. Klaskin. At an initial evaluation in November of 2015, Dr. Klaskin noted that Williams had worsening fibromyalgia symptoms, with pain mostly in her neck, shoulders, hips, lower back, wrists, and ankles. (Tr. 907). Physical examination revealed multiple tender areas in her arms and back but 5/5 strength in her upper and lower extremities. (Tr. 909). In January 2016, treatment notes indicated that Williams' pain was a 9/10, and she had some swelling in her hands and ankles. (Tr. 901). It was noted that she reported joint pain and muscle pain, and on exam she had a negative straight leg raise but tenderness along her spine and in her lower back.

4

(Tr. 638). At this time, she had also started physical therapy for her fibromyalgia pain. (Tr. 641). In February, it was noted that after taking medication, Williams' pain was between a 2-3, as opposed to a 7-8 without medication. (Tr. 895). In April and May of 2016, treatment notes indicated that Williams was "doing well as far as her fibromyalgia is concerned." (Tr. 892-93).

Williams continued to treat with Dr. Klaskin for her pain, and an October 2016 examination revealed that range of motion in the cervical spine and upper and lower extremities were normal, and strength was 5/5. (Tr. 880). Treatment notes in November and December 2016 indicate that Williams had normal range of motion in her cervical spine and upper extremities and her strength was 5/5. (Tr. 1186-87). In March of 2017, it was noted that Williams' medication helped her to function with her fibromyalgia, and that she had some back pain after she had helped someone move. (Tr. 1183). Dr. Klaskin dropped the dosage of her narcotics taken to manage her pain. (Id.) In May of 2017, Dr. Klaskin noted that while she still had some fibromyalgia symptoms, her pain was a 3/10 with the medication, rather than an 8-9 without it. (Tr. 1180). Treatment notes from May 2017 indicated Williams experienced some pain after gardening, but in June it was noted that she was doing better, and the pain was manageable. (Tr. 1177-78). Dr. Piper's notes indicated that Lyrica was helping with Williams' fibromyalgia pain. (Tr. 1013). While it was noted

that she was experiencing some pain from September to December 2017, examinations found that she had normal range of motion in her cervical spine and extremities, and that her reflexes were normal. (Tr. 1166-71). During this time, it was noted that pain management was cutting back on her medications, but also that monthly B12 injections were helping with her pain and her cognitive fogginess. (Tr. 990, 998).

Williams continued to treat with Dr. Klaskin after December 31, 2017, and treatment notes indicate that her fibromyalgia was "acting up quite a bit" in January 2018. (Tr. 1165). However, in April 2018, Dr. Klaskin noted that "she is doing good as far as her headaches and fibromyalgia are concerned." (Tr. 1160). On examination, Williams was walking better, had better posture, her range of motion was normal, and her strength was 5/5. (Id.) In May of 2019, Dr. Klaskin filled out a fibromyalgia checkbox form, indicating that Williams had 11 of 18 positive tender points and widespread pain. (Tr. 485).

During the relevant time period, Williams was also treated for migraine headaches. From 2013-2015, Dr. Piper's treatment notes indicated that Williams reported experiencing headaches. (Tr. 621, 625, 627, 724-25, 753). A May 2016 treatment note from Dr. Klaskin indicated that she saw an ENT for her headaches, and at a June 2016 follow up, he noted that she had a history of migraines and

concussions. (Tr. 889-90). While she was taking Topamax as prescribed, Dr. Klaskin also encouraged Williams to try a gluten-free diet. (Tr. 887). At a June 22, 2016 visit, Williams reported that she had no headaches and had a "great week," and that the Topamax was helping. (Tr. 886). In July and August of 2016, Williams reported doing "great" with her headaches. (Tr. 883-85). She told Dr. Klaskin that she was experiencing only one migraine a month as opposed to one every 2-3 days. (Tr. 883). Similarly, from September 2016 to May of 2018, Dr. Klaskin's notes indicate that Williams' headaches were doing much better, in that she was reporting only one or two, or sometimes no migraines in a month. (Tr. 880-82, 1158-88).

It is against this medical backdrop that a hearing was held before an ALJ on January 22, 2018. (Tr. 86-99). A continuance was then entered to allow the plaintiff to obtain counsel, and a second ALJ held a hearing on Williams' Title II claim on May 6, 2019. (Tr. 37-83). At the hearing, both Williams and a Vocational Expert testified. By a decision dated June 24, 2019, the ALJ denied Williams' application for benefits. (Tr. 16-30).

In that decision, the ALJ first concluded that Williams had not engaged in any substantial gainful activity from the alleged onset date of May 1, 2012 through the date last insured of December 31, 2017. (Tr. 18). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Williams had the following

7

severe impairments: obesity, thoracic outlet syndrome, chronic fatigue syndrome, degenerative disc disease of the lumbar and thoracic spine, major depressive disorder, and ADHD. (Tr. 19). On this score, the ALJ discussed Williams' history of migraines, but ultimately determined that her migraines were a nonsevere impairment. (Id.) The ALJ noted that Williams had been experiencing migraine headaches since 2014, but treatment notes indicated that Williams' migraines were controlled on medication. (Id.) Specifically, the ALJ pointed to treatment notes from 2016, 2017, and into 2018 which indicated that Williams' migraines had improved significantly. (Id.)

At Step 3, the ALJ determined that Williams did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Tr. 20-22). Specifically, with respect to Williams' concentration, persistence and pace, the ALJ found that Williams had a moderate limitation. The ALJ noted that Williams had trouble concentrating when she stopped taking her medications, but that treatment notes indicated she concentrated better when taking her prescribed medication for ADHD. (Tr. 21).

Between Steps 3 and 4, the ALJ fashioned a residual functional capacity (RFC), considering Williams' limitations from her impairments:

> After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to

8

perform light work as defined in 20 CFR § 404.1567(b) except that she may occasionally balance, stoop, kneel, crouch, crawl, climb ramps and stairs, reach overhead bilaterally, and push and pull bilaterally, but must never climb ladders, ropes, or scaffolds and must never be exposed to extreme cold or workplace hazards. The claimant must be able to change positions between sitting and standing, but doing so will not take them off task more than what is customary in the work setting. The claimant retains the mental capacity to perform simple, routine tasks in an environment with occasional changes in the work setting.

(Tr. 22).

Specifically, in making the RFC determination, the ALJ considered the medical evidence, medical opinions, and Williams' testimony regarding her impairments.[2] With respect to Williams' testimony, the ALJ noted that Williams stated that she needed help dressing, bathing, caring for herself, and feeding herself. (Tr. 23). Williams stated that she had trouble sleeping because of her pain, and that her pain limited her range of motion. (Id.) Further, Williams alleged that her physical conditions limited her ability to lift, carry, stand, walk, sit, kneel, climb stairs, and complete tasks, and that her mental impairments caused her to have difficulty concentrating and remembering. (Id.) However, the ALJ ultimately determined that Williams' statements were not consistent with the evidence of record. (Id.)

---

[2] While the ALJ considered all of the claimant's impairments in determining that Williams was not disabled, Williams' appeal focuses on the ALJ's treatment of her fibromyalgia, migraines, and her ability or inability to stay on task. Thus, we will discuss only those impairments that are relevant to Williams' appeal.

9

On this score, the ALJ discussed Williams' degenerative disc disease, noting that she had pain in her neck and low back. (Id.) However, the ALJ noted that in 2013, Williams received injections that helped relieve her pain. (Id.) The ALJ recognized that Williams' treatment provider recommended a conservative course of treatment including exercise. (Tr. 24). In 2016, Williams began aquatic therapy and was prescribed narcotics that helped alleviate her pain. (Id.) However, this therapy was discontinued due to noncompliance, as Williams failed to attend seven visits. (Id.) In 2017, Williams experienced an increase in pain and began receiving steroid injections. (Id.) Ultimately, her pain management specialist decreased her narcotics medication. (Id.) The ALJ also noted that the medical evidence indicated Williams had normal range of motion throughout the relevant time period, despite Williams' assertion to the contrary. (Id.)

The ALJ also discussed William's fibromyalgia. (Tr. 25). The ALJ ultimately concluded that Williams did not display at least 11 tender points throughout the period at issue in the decision. (Id.) The ALJ noted that Williams was prescribed narcotics in February 2016 for this impairment, which helped to control her symptoms. (Id.) In May 2016, Williams began taking Lyrica, which she reported improved her overall pain levels and ability to function. (Id.) While treatment notes indicated that she experienced an increase in pain in August 2017, the ALJ noted

10

that the treatment notes did not indicate that she had any musculoskeletal problems. (Id.) The ALJ also noted that Williams reported in November 2017 that her B12 injections were helping to relieve her pain. (Id.)

Finally, with respect to her mental impairments, the ALJ noted that Williams had a history of ADHD and depression. (Tr. 26). However, the ALJ found that the treatment notes showed largely normal psychiatric findings during the relevant time period. (Id.) It was also noted that Williams independently discontinued her Adderall medication in 2017, which led to her inability to think clearly and caused her to be sleepy. (Id.) While Williams restarted her medication, her speech was thickened and hesitant. (Id.) However, in October 2017, Williams reported starting a new depression medication that was very helpful for her. (Id.) At that time, treatment notes indicated Williams was happier, brighter, and had no difficulty with memory or speech. (Id.) Further, the ALJ noted that in May of 2018, after the relevant period, treatment notes showed continued improvement with her depression. (Tr. 27).

Ultimately, the ALJ concluded that Williams' conditions were not as debilitating as she had alleged. (Id.) The ALJ reasoned that Williams showed continued improvement with medications and injections. (Id.) Further, treatment notes showed normal range of motion throughout the relevant period, as well as findings of normal judgment, thought content, cognition, and memory. (Id.) The ALJ

also reasoned that Williams' activities of daily living suggested that her impairments were not as debilitating as she alleged, in that Williams was able to prepare meals and perform housework, bathe and take care of herself, care for pets, and operate a motor vehicle. (Id.)

The ALJ then considered the medical statements from two state agency consultants. The ALJ gave the opinion of Dr. Hong Park, M.D., great weight. (Id.) Dr. Park opined that Williams could perform light work with postural limitations, including occasionally balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs, but could never climb ladders, ropes, or scaffolds. (Id.) Dr. Park further opined that the plaintiff was limited in her ability to reach overhead and must avoid exposure to extreme colds and hazards. (Id.) The ALJ noted that this opinion was consistent with the medical record, in that the record established a normal range of motion and 5/5 strength, but that Williams' pain causes her to be limited in her performance at all exertional levels. (Id.)

The ALJ also considered the opinion of Karen Weitzner, Ph.D., who opined that Williams had moderate difficulties in maintaining concentration, persistence, or pace, but no restriction in her activities of daily living. (Id.) The ALJ reasoned that this opinion was supported by treatment notes indicating that Williams had a history of ADHD that impacted her ability to concentrate on speaking. (Tr. 28). However,

12

the ALJ gave the opinion only partial weight, in that the ALJ found that the remainder of Dr. Weitzner's opinion understated Williams' impairments because the record indicated cognitive fogginess and depression, which impacted Williams' ability to interact with others. (Id.)

Having arrived at this RFC assessment, the ALJ found at Step 4 that Williams was unable to return to her past relevant work as an office coordinator or medical receptionist. (Tr. 28). However, the ALJ made a finding at Step 5 that Williams could perform work available in the national economy as an electrical assembler, electronics worker, or parts assembler. (Tr. 29). Accordingly, the ALJ concluded that Williams did not meet the stringent standard for disability set by the Act and denied her claim. (Tr. 30). Williams filed a request for review on July 5, 2019. (Tr. 12). The Appeals Council denied this request. (Tr. 1-6).

This appeal followed. (Doc. 1). On appeal, Williams contends that the ALJ erred in several respects when denying her disability claim, arguing that the ALJ failed to find that her migraines and fibromyalgia were severe impairments, and that the ALJ failed to adequately consider Williams' subjective complaints as it relates to her inability to stay on task. This case is fully briefed and is, therefore, ripe for resolution. For the reasons set forth below, we will affirm the decision of the Commissioner.

13

## III.   Discussion

### A.   Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote

a lack of substantial evidence") (alterations omitted); <u>Burton v. Schweiker</u>, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); <u>see also</u> <u>Wright v. Sullivan</u>, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); <u>Ficca</u>, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." <u>Zirnsak v. Colvin</u>, 777 F.3d 607, 611 (3d Cir. 2014) (citing <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." <u>Burnett v. Comm'r of Soc. Sec. Admin.</u>, 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable

16

meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

**B.** **Initial Burdens of Proof, Persuasion, and Articulation for the ALJ**

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a).  To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the

insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

19

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at

20

*5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar

v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun

v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12,

2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366

(M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating

the existence of a medically determinable impairment that prevents him or her in

engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this

burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show

that jobs exist in significant number in the national economy that the claimant could

perform that are consistent with the claimant's age, education, work experience and

RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive

requisites. Most significant among these legal benchmarks is a requirement that the

ALJ adequately explain the legal and factual basis for this disability determination.

Thus, in order to facilitate review of the decision under the substantial evidence

standard, the ALJ's decision must be accompanied by "a clear and satisfactory

explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d

Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate

which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

### C. Legal Benchmarks for the ALJ's Assessment of Medical Opinion Evidence

The Commissioner's regulations also set standards for the evaluation of medical evidence and define medical opinions as "statements from acceptable medical sources that reflect judgments about the nature and severity of [the plaintiff's] impairments, including [the plaintiff's] symptoms, diagnosis and prognosis, what [he or she] can still do despite impairments, and [the plaintiff's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1).[3] Regardless of its source, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. § 404.1527(c).

In deciding what weight to accord to competing medical opinions and evidence, the ALJ is guided by factors outlined in 20 C.F.R. § 404.1527(c). "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-

---

[3] Because Williams filed his disability application prior to March 27, 2017, the regulations in effect prior to March 27, 2017 are applicable here.

22

6p, 1996 WL 374180 at *2. Treating sources have the closest ties to the claimant, and therefore their opinions generally entitled to more weight. See 20 C.F.R. § 404.1527(c)(2) ("Generally, we give more weight to opinions from your treating sources..."); 20 C.F.R. § 404.1502 (defining treating source). Under some circumstances, the medical opinion of a treating source may even be entitled to controlling weight. 20 C.F.R. § 404.1527(c)(2); see also SSR 96-2p, 1996 WL 374188 (explaining that controlling weight may be given to a treating source's medical opinion only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with the other substantial evidence in the case record).

Where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where applicable, in deciding the weight given to any non-controlling medical opinions: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention. 20 C.F.R. § 404.1527(c).

At the initial level of administrative review, State agency medical and psychological consultants may act as adjudicators. See SSR 96-5p, 1996 WL 374183 at *4. As such, they do not express opinions; they make findings of fact that become part of the determination. Id. However, 20 C.F.R. § 404.1527(e) provides that at the ALJ and Appeals Council levels of the administrative review process, findings by non-examining state agency medical and psychological consultants should be evaluated as medical opinion evidence. Therefore, ALJs must consider these opinions as expert opinion evidence by nonexamining physicians and must address these opinions in their decisions. SSR 96-5p, 1996 WL 374183 at *6. Opinions by state agency consultants can be given weight "only insofar as they are supported by evidence in the case record." SSR 96-6p, 1996 WL 374180 at *2. In appropriate circumstances, opinions from nonexamining state agency medical consultants may be entitled to greater weight than the opinions of treating or examining sources. Id. at *3.

Oftentimes, as in this case, an ALJ must evaluate medical opinions and records tendered by both treating and non-treating sources. Judicial review of this aspect of ALJ decision-making is guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or state agency consultants – must make the

ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, "[w]here, . . . , the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

### D.    The ALJ's Decision was Supported by Substantial Evidence.

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Judged against these deferential standards of review, we find that substantial evidence supported the decision by the ALJ that Williams was not disabled. Therefore, we will affirm this decision.

25

Williams first challenges the ALJ's decision by arguing that the ALJ did not find her migraines and her fibromyalgia to be severe impairments at Step 2 of the sequential analysis. However, a review of the record shows that there is substantial evidence to support the ALJ's Step 2 determination. Further, even if the ALJ erroneously concluded that these impairments were nonsevere, the error is harmless and does not require a remand. Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 145 n.2 (3d Cir. 2007).

Step 2 of the sequential analysis that governs Social Security appeals is a "*de minimis* screening device to dispose of groundless claims." McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360-61 (3d Cir. 2004) (citations omitted). On this score, "[f]ailing to find an impairment to be severe may be harmless when the ALJ does not deny benefits at that step and properly considered the condition in the remaining analysis." Edinger v. Saul, 432 F.Supp.3d 516, 531 (E.D. Pa. 2020). Indeed, "the analysis at step two is wholly independent of the analysis at later steps," and "not finding certain impairments severe at step two does not affect the ultimate disability determination." Alvarado v. Colvin, 147 F.Supp.3d 297, 311 (E.D. Pa. 2015).

In the instant case, we conclude that any error in finding that Williams' migraines and fibromyalgia were not severe impairments is harmless because the ALJ considered both of these impairments in the remaining analysis. As we have

noted, the ALJ found Williams' migraines to be nonsevere at Step 2. The ALJ noted that Williams had been experiencing migraine headaches since 2014, but treatment notes indicated that Williams' migraines were controlled on medication. (Tr. 19). Specifically, the ALJ pointed to treatment notes from 2016, 2017, and into 2018 which indicated that Williams' migraines had improved significantly. (Id.) Indeed, from September 2016 to May of 2018, Dr. Klaskin's notes indicated that Williams' headaches were doing much better, in that she was reporting only one or two, or sometimes no migraines in a month, whereas she used to experience 2-3 per week. (Tr. 880-82, 1158-88). Accordingly, substantial evidence supports the finding that Williams' migraines were a nonsevere impairment.

As for her fibromyalgia, while the ALJ did not include a discussion of this impairment at Step 2, the ALJ did in fact consider Williams' fibromyalgia in her RFC determination. On this score, the ALJ ultimately concluded that Williams did not display at least 11 tender points throughout the period at issue in the decision. (Tr. 25). The ALJ noted that Williams was prescribed narcotics in February 2016 for this impairment, which helped to control her symptoms. (Id.) In May 2016, Williams began taking Lyrica, which she reported improved her overall pain levels and ability to function. (Id.) While treatment notes indicated that she experienced an increase in pain in August 2017, the ALJ noted that the treatment notes did not indicate that she

27

had any musculoskeletal problems. (Id.) The ALJ also noted that Williams reported in November 2017 that her B12 injections were helping to relieve her pain. (Id.) Thus, while the ALJ did not discuss Williams' fibromyalgia at Step 2, the ALJ did include a discussion of fibromyalgia in her explanation of the plaintiff's RFC. Accordingly, if failing to find that Williams' fibromyalgia was a severe impairment was in error, any error was harmless, as the ALJ did consider the plaintiff's fibromyalgia in her ultimate disability determination.

Finally, Williams contends that the ALJ erred when she failed to adequately consider the plaintiff's subjective complaints regarding how her pain affects her ability to stay on task. The plaintiff argues that there was not substantial evidence to support a finding of occasional postural limitations that would take Williams off task no more "than what is customary in the work setting." However, we find that substantial evidence supports the ALJ's finding.

Here, the RFC limited the plaintiff to occasional postural limitations with the ability to change positions between sitting and standing, which the ALJ found would not take the claimant off task more than what is customary in the work setting. (Tr. 22). On this score, the ALJ considered Williams' statements regarding her ability to perform postural movements and concentrate, but ultimately concluded that Williams' statements were inconsistent with the medical evidence. With respect to

28

her lower back pain, the ALJ noted that treatment records indicated Williams was able to ambulate and perform her activities of daily living. (Tr. 23). The ALJ also noted that the treatment notes consistently showed that Williams' pain improved with pain medication, and her examinations revealed normal findings with regard to her strength and range of motion. (Tr. 24). Indeed, specifically with respect to Williams' fibromyalgia, the ALJ reasoned that "[t]he claimant began taking Lyrica for this condition in 2017, at which time she reported improvement in her overall pain levels and an increased ability to function." (Tr. 25).

Moreover, with respect to her mental impairments, the ALJ noted that Williams' depression and ADHD at times affected her ability to concentrate. However, the ALJ also noted that treatment records noted normal psychiatric findings with respect to judgment, thought content, cognition, and memory. (Tr. 26). The ALJ further reasoned that treatment notes from 2017 showed the plaintiff started a new depression medication that she reported was helpful. (Id.) The ALJ concluded that Williams' conditions were ultimately not as debilitating as alleged:

> Treatment notes generally indicate that the claimant experienced improvement in her conditions. Specifically, treatment notes indicate that the claimant's symptoms improved with the use of medications around the date last insured. The claimant's back conditions and fibromyalgia were treated with pain medications. Her chronic was treated with injections and vitamins to stabilize her B12 and vitamin D levels. In addition, her symptoms related to the claimant's thoracic outlet syndrome was treated conservatively in the form of wrist splints.

29

Finally, her mental health conditions were also treated with medications that allowed her to feel happier. In addition, despite the claimant's impairments, treatment notes generally indicated that the claimant maintained her strength and range of motion. In addition, she generally maintained normal judgment, thought content, cognition, and memory. Similarly, the claimant's activities of daily living suggest that her conditions are not as debilitating as alleged. The claimant is able to dress, bathe, care for her hair, shave, and use the bathroom without assistance from others. She is able to prepare meals on a daily basis and perform housework including doing laundry, loading the dishwasher, and completing light housework. The claimant is also able to care for pets by feeding them and letting them out to use the bathroom. She is able to go out alone and can operate a motor vehicle. She has an understanding of finances and can pay bills, count change, handle a savings account, and use a checkbook and money orders.

(Tr. 27).

We find that the ALJ's conclusion is supported by substantial evidence in the record. As we have noted, the ALJ gave great weight to the opinion of Dr. Park, who opined that Williams could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but could never climb ladders, ropes, or scaffolds. (Id.) Dr. Park further opined that the plaintiff was limited in her ability to reach overhead and must avoid exposure to extreme colds and hazards. (Id.) The ALJ noted that this opinion was consistent with the medical record, in that the record established a normal range of motion and 5/5 strength, but that Williams' pain causes her to be limited in her performance at all exertional levels. (Id.) The ALJ also gave partial weight to the opinion of Dr. Weitzner with respect to Williams' moderate difficulty

30

in maintaining concentration, persistence, and pace. (Tr. 28). The ALJ found that this opinion was consistent with the medical record which showed that Williams' ADHD impacted her ability to concentrate, but that the condition was well controlled on medications. (Id.)

We note that the question of disability is a legal determination and is not wholly dictated by medical opinions. Indeed, it is well settled that "[t]he ALJ–not treating or examining physicians or State agency consultants–must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361. Further, in making this assessment of medical opinion evidence, "[a]n ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion." Durden, 191 F.Supp.3d at 455. Finally, when there is no evidence of any credible medical opinion supporting a claimant's allegations of disability it is also well settled that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

In this case, the ALJ was confronted by two medical opinions by state agency consulting doctors. The ALJ considered these opinions against the objective medical evidence in the record and explained why some weight was given to certain opinions and why she found the opinions consistent with the medical evidence. The ALJ further considered the plaintiff's subjective complaints against the objective medical

evidence and concluded that the evidence was not consistent with Williams' alleged level of limitation. We again note that "[t]he ALJ – not treating or examining physicians or State agency consultants–must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361. Accordingly, we find that the ALJ properly considered all of the medical evidence and the plaintiff's subjective complaints and adequately explained her reasoning for the weight given to the various medical opinions in this case to determine the range of light work Williams could perform.

On the facts as outlined above, the ALJ found that Williams had not met the stringent standard for disability set by law. It is the right and responsibility of the ALJ to make such assessments and we find that substantial evidence supported the ALJ's decision in the instant case.  Thus, at bottom, it appears that Williams is requesting that this Court re-weigh the evidence. This we may not do. See, e.g., Rutherford, 399 F.3d at 552 (quoting Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992) ("In the process of reviewing the record for substantial evidence, we may not 'weigh the evidence or substitute our own conclusions for those of the fact-finder'")). Because we cannot re-weigh the evidence, and because we find that the ALJ properly articulated that substantial evidence did not support this disability claim, we will affirm the ALJ's decision in this case.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.' " Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

## IV.   Conclusion

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.

Submitted this 3d day of December, 2021.

*s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

33